**AKERMAN LLP**
JUSTIN D. BALSER (SBN 213478)
Email: justin.balser@akerman.com
PARISA JASSIM (SBN 273915)
Email: parisa.jassim@akerman.com
601 W. Fifth Street, Suite 300
Los Angeles, California 90071
Telephone: 213.688.9500
Facsimile: 213.627.6342

Attorneys for Plaintiff
PRIVATE NATIONAL MORTGAGE
ACCEPTANCE COMPANY, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PRIVATE NATIONAL MORTGAGE ACCEPTANCE COMPANY, LLC.<br><br>Plaintiff,<br><br>v.<br><br>PROPRIETARY CAPITAL, LLC, a Delaware limited liability company; BRANDON D. WATTS, an individual, and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:**<br><br>**(1) VIOLATION OF DEFEND TRADE SECRETS ACT, 18 U.S.C. SECTION 1836,** *ET SEQ.***;**<br><br>**(2) VIOLATION OF CALIFORNIA UNIFORM TRADE SECRETS ACT, CALIFORNIA CIVIL CODE SECTION 3426,** *ET SEQ.***; AND**<br><br>**(3) VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE SECTION 17200,** *ET SEQ.*<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Private National Mortgage Acceptance Company, LLC (**PennyMac**) complains against defendants Proprietary Capital, LLC (**PropCap**) and Brandon D. Watts as follows:

## NATURE OF ACTION

1. PennyMac brings this action against Brandon Watts and PropCap for misappropriation of its proprietary EBO Cashflow Model.

2. PennyMac is among the nation's largest non-bank mortgage loan originators,

1    CASE NO. TBD
**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
57552229;1

servicers, and investors.  It is a leader in identifying and purchasing profitable early buyout loans from Government National Mortgage Association (**Ginnie Mae**), also known as EBOs.

3. PennyMac spent years collecting the valuable loan data, developing formulas, creating cash flow strategies, and preparing documentation for EBO purchases and sales contained in its EBO Cashflow Model.

4. The profit opportunity associated with EBO loans attracts investment managers like PropCap but, like other private investors, PropCap does not have its own empirical loan-level data to develop equivalent pricing, cash flow models, and strategies.

5. PropCap instead hired away PennyMac employees starting with Brandon Watts to overcome its limitations.  Mr. Watts stole PennyMac's EBO Cashflow Model and confidential transaction documents for PropCap's own competitive advantage.

6. Mr. Watts brazenly sent a copy of PennyMac's stolen EBO Cashflow Model containing PennyMac's proprietary and confidential borrower performance data, cash flow analyses, and formulas to PennyMac in an effort to gain its business while employed at PropCap and on PropCap's behalf.

7. PropCap then engaged in a concerted plan to poach more knowledgeable PennyMac employees replicating PennyMac's proprietary EBO investment capabilities.

## PARTIES, JURISDICTION, AND VENUE

8. PennyMac is a Delaware limited liability company with its principal place of business located in Westlake Village, California.  PennyMac owns the trade secrets and proprietary information PropCap and Mr. Watts misappropriated.

9. PropCap is a Delaware limited liability company with its principal place of business in Colorado.  PropCap is an investment manager specializing in commingled and single-investor portfolios in the residential mortgage-backed securities market and purchases EBO loans from loan servicers for investment.

10. Brandon Watts is an individual who resides in Sherman Oaks, California.  Mr. Watts is currently employed as a Portfolio Manager at PropCap.  PennyMac

AKERMAN LLP
601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342

2  CASE NO. TBD
**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**
57552229;1

employed Mr. Watts in its Moorpark and Westlake Village, California locations from 2014 through 2020.

11. This court has specific jurisdiction over PropCap because it hired Mr. Watts and other employees, including former PennyMac employees, knowing they would live and work for PropCap in California full-time. PropCap further knew Mr. Watts and other former PennyMac employees would work to expand the company's business in California and has solicited PennyMac's business in California.

12. This court has general personal jurisdiction over Mr. Watts because he is domiciled in California.

13. This court has subject matter jurisdiction over PennyMac's federal trade secret claim under 18 U.S.C § 1836 *et seq*. and 28 U.S.C. § 1331. This court has supplemental jurisdiction over PennyMac's state law claims under 28 U.S.C. § 1367.

14. Venue is proper in this district because a substantial part of the events giving rise to PennyMac's claims occurred in this district. 28 U.S.C. § 1391(b).

## GENERAL ALLEGATIONS

### A. PennyMac's EBO Investments

15. PennyMac operates in three business segments: loan production, loan servicing, and investment management.

16. PennyMac's loan production segment produces certain residential mortgage loans which PennyMac pools together and places into mortgage-backed securities guaranteed by Ginnie Mae.

17. PennyMac's loan servicing segment contracts with Ginnie Mae to service the securitized loans. PennyMac is Ginnie Mae's leading loan securitizer and servicer. Because of this long-standing relationship, PennyMac possesses substantial non-public data on Ginnie Mae loan performance, default, and foreclosure rates.

18. PennyMac's investment management business manages PennyMac Mortgage Investment Trust, a specialty finance company that invests primarily in residential mortgage loans and mortgage-related assets.

19. Ginnie Mae contractually allows servicers like PennyMac to buy loans out of their respective mortgage-backed securities early, including EBOs—loans where a borrower is 90 or more days delinquent on his or her payment obligations.

20. PennyMac may, but is not obligated to, buy out EBO loans.

21. PennyMac can buy out EBOs for the loans' remaining unpaid principal balance. It can then retain the loan, re-deliver the loan into a new mortgage-backed security after it re-performs, or resell the loan to a third party.

22. An EBO becomes re-performing after the borrower cures the delinquency, often through a loan modification or other loss mitigation program.

23. PennyMac can typically retain, resell to a third party, or re-deliver an EBO into a new security for profit.

24. Profitability depends greatly on the costs to service the loan and the length of time it takes the loan to re-perform.

25. Some EBOs never re-perform or become profitable after buy out.

26. But PennyMac has a proven track record of identifying EBOs it can turn into performing loans and resell or redeliver for profit based on its years of servicing experience, its extensive experience as a Ginnie Mae servicer, and its in-depth borrower performance data.

27. PennyMac's reported fourth-quarter 2020 results reflected its meaningful EBO activity with almost $200 million in net gains.

**B.   PennyMac's EBO Cashflow Model**

28. PennyMac hired Mr. Watts as a Vice President, Business Development in 2014 to support bulk mortgage servicing rights acquisitions. His duties later included improving PennyMac's EBO purchasing portfolio.

29. Mr. Watts ran PennyMac's Servicing Investments group where he and his team developed and enhanced PennyMac's proprietary EBO Cashflow Model.

30. The EBO Cashflow Model is an electronic file containing confidential and proprietary data, formulas, assumptions, and vectors.

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

57552229;1

31. PennyMac's employees designed the Model to compile PennyMac's years of proprietary borrower performance data and analyze past borrower performance trends. The Model also incorporates regression and statistical analysis results to project future borrower performance and PennyMac cash flow.

32. The EBO Cashflow Model has two primary components: (**1**) the framework; and (**2**) the inputs. Both are proprietary and confidential.

33. The framework is the EBO Cashflow Model's structure (*i.e.*, the columns, formulas, and calculations within the file). It helps PennyMac understand the various cash flow components.

34. The inputs—the borrower data flowing through the EBO Cashflow Model—are derived from PennyMac's historical data collection and generated through PennyMac's proprietary statistical model. For instance, PennyMac inputs historical foreclosure timeline, modification, short sale, deed-in-lieu of foreclosure, reinstatement, and payoff activity data into the EBO Cashflow Model to predict the percentage of loans that will result in foreclosure, modification, short sale, deed-in-lieu of foreclosure, reinstatement, and payoff in the future.

35. The EBO Cashflow Model proprietary formulas then show how the foreclosure, modification, short sale, deed-in-lieu of foreclosure, reinstatement, and payoff percentage vectors impact an EBO investment.

36. PennyMac uses the Model to predict EBO profitability. It helps PennyMac determine whether to buy potential EBOs, predict cash flow, and create pricing for sale purposes. It also provides PennyMac a unique advantage in determining profitability and realizing profit over its competitors.

37. PennyMac spent time, money, and resources developing the Model.

**C.  PennyMac maintains the EBO Cashflow Model's confidentiality**

38. All PennyMac employees, including Mr. Watts, are subject to PennyMac's strict confidentiality guidelines and must abide by PennyMac's Employee Handbook and Code of Conduct and Ethics as an employment condition.

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

57552229;1

39. The Employee Handbook confirms PennyMac considers its EBO Cashflow Model proprietary PennyMac work product:

> Any and all inventions, discoveries, developments, improvements, advances, and works of authorship, copyrights, patents, trademarks, trade secrets, suggestion or other intellectual property rights relating thereto in any and all countries that an employee has made, or conceived, or may make or conceive at any time during his or her employment with PennyMac (solely or jointly with others) and that relates to PennyMac's business activities, directly or indirectly, whether or not patentable, copyrightable, or protectable under mask work legislation or trademark laws . . . or any other law shall be the exclusive property of PennyMac . . . and shall be deemed "Proprietary Information."
>
> * * * *
>
> Any work in which the employee is engaged during the course of employment with PennyMac . . . also shall be deemed PennyMac's Proprietary Information. This property is of a confidential nature and may not be disclosed to others or made use of by any employee during or after their employment by PennyMac. Upon an employee's termination, any and all documents must be returned to PennyMac immediately.
>
> * * * *
>
> Any work in which the employee is engaged in during his or her employment with PennyMac . . . is considered PennyMac's property and is confidential. Accordingly, it shall be held in strict confidence and shall not be disclosed or made use of by any employee during his or her employment with PennyMac (except to PennyMac's benefit to the extent necessary to perform his or her obligations) or after termination of employment with PennyMac. As such, PennyMac's records, reports, software, products or documents may not be removed or copied at any time without prior management written approval and as required in the performance of duties for PennyMac. Upon an employee's termination, any documents relating to Proprietary Information or work performed by the employee or others for PennyMac shall be returned to PennyMac immediately.

40. Confidential and proprietary information and trade secrets include "information related to pricing, profits, costs, markets, operations, customers, sales, products, business plans, personnel, technical processes, trading of stock and other business affairs and methods that are not readily available to the public."

41. PennyMac confirmed all proprietary information must be kept strictly confidential in its Handbook: "Any violation of confidentiality may seriously injure PennyMac's reputation, goodwill, profitability and effectiveness . . . Any improper transfer of material or disclosure of trade secrets of confidential information constitutes unacceptable conduct."

42. PennyMac also prohibits personal use of company property: "Company

Property is available solely for use in the course and scope of business operations and in performance of job responsibilities."

43. Company Property includes "systems and processes; . . . computer hardware and software; . . . Intellectual Property such as electronic files, documents, software and other similarly situated programs, presentations and proprietary information; time and labor; products and services; or any other necessary and appropriate resource for use in the operation of the business."

44. "[A]ll employees hired by PennyMac are prohibited from using any such Proprietary Information or confidential information for their own benefit or for the benefit of anyone other than PennyMac.  Further, all employees are required to protect and safeguard all such Proprietary Information and confidential information from unauthorized disclosure."

45. PennyMac strictly prohibits technology misuse under the Employee Handbook, including "[a]ttempting to modify or remove computer hardware, software or other equipment without authorization. . . [N]o one is permitted to remove and/or make copies of Company records, reports or documents without prior management approval."

46. PennyMac's Code of Conduct and Ethics likewise contains strict confidentiality requirements.

47. Mr. Watts formally acknowledged the Employee Handbook and Code of Conduct and Ethics through signing acknowledgment forms, most recently in 2019.

48. Mr. Watts knows the EBO Cashflow Model is a proprietary file containing trade secrets and confidential information as one of its co-creators.

49. Mr. Watts also knows the EBO Cashflow Model's confidentiality is vitally important as a Model creator and user.

50. PennyMac does not share any portion of the EBO Cashflow Model outside the organization without ensuring strict confidentiality.  It has never provided anything other than a stripped-down version of the EBO Cashflow Model to outside parties.

51. PennyMac consistently requires any receiving person or entity execute a

1 strict non-disclosure agreement before disseminating the stripped-down document.

### D. EBO Cashflow Model misappropriation

52. PropCap hired Mr. Watts in August or September 2020 as an investment portfolio manager and to manage its EBO purchase funding.

53. PropCap has a specific interest in PennyMac's EBO Cashflow Model to identify EBO investment opportunities and solicit loan servicers for EBO purchases.

54. Mr. Watts tendered his resignation to PennyMac in August 2020, but appropriated and retained a copy of the EBO Cashflow Model for his own personal use before his last day of employment at PennyMac on September 1, 2020.

55. Mr. Watts also forwarded PennyMac's confidential and proprietary EBO transaction deal documents to his personal email address on August 11, 2020. The documents include PennyMac's Flow Sale Agreement, Mortgage Servicing Agreement, Representation and Warranty Agreement, and Form of Purchase Confirmation created in connection with a sale closing package. These documents contain proprietary information and result from significant time spent creating and negotiating their contents.

56. On October 26, 2020, PennyMac sent PropCap's managing partner, Craig Cohen, a letter alerting PropCap all current and former PennyMac employees are subject to confidentiality restrictions prohibiting them from utilizing or disclosing PennyMac's trade secrets or its proprietary and confidential information, including but not limited to proprietary tools and spreadsheets.

57. PennyMac discovered Mr. Watts' EBO Cashflow Model misappropriation when Mr. Watts emailed PennyMac employees Vala Fartaj and Jon Coleman at least twice in October 2020, after starting employment at PropCap.

58. Mr. Watts attached an EBO model to his October 29, 2020 email with the subject line: "Prop Cap EBO Pricing – Updated." The attached file was entitled: "EBO Partnership_Prop Cap_Pricing_Modeled Cashflows_Penny_10.29.2020.xlsx."

59. Mr. Watts sent the email from his PropCap email address in an attempt to earn EBO investment business from PennyMac, stating:

> Attached for your benefit, and in the spirit of transparency, is a file that contains assumptions and cashflows for the FHA partial claims; also included are high level assumptions around the new 90 flows, which are based on pre-COVID [sic] re-performance assumptions but current interest rate and MBS levels. As you will see, our pricing has improved significantly, and we are the best bid in the market for EBOs.

60. But Mr. Watts neglected to scrub the EBO model he attached for metadata:



61. The metadata shows the file was created on August 25, 2017, three years before Mr. Watts left for PropCap and on the exact day PennyMac created its EBO Cashflow Model. It shows the creating company as "PennyMac USA."

62. Mr. Watts' spreadsheet is also nearly identical to PennyMac's EBO Cashflow Model. The fields in both files are largely the same and contain identical formulas. The foreclosure vectors in the PennyMac EBO Cashflow Model track the PropCap model exactly, down to 16 decimal places. Mr. Watts simply added a term sheet and changed some coloring to try to pass it off as a PropCap-created file.

63. Mr. Watts and PropCap subsequently engaged in an orchestrated effort to poach PennyMac employees with significant proprietary data and EBO Cashflow Model

knowledge, enhancing their trade secret misappropriation. The employees poached are unique to PennyMac's Servicing Investments group, demonstrating PropCap's interest in retaining PennyMac's EBO Cashflow Model for its own advantage.

64. Mr. Watts and PropCap stole PennyMac's intellectual property to avoid spending significant funds developing formulas, applications, programs, and databases and because it lacks historical EBO performance data, industry data, and experience unique to PennyMac. The EBO Cashflow Model theft, alone and in conjunction with the theft of PennyMac's proprietary deal documents and poached employees, confirms PropCap and Mr. Watts' intent to misappropriate PennyMac's entire EBO business model. The EBO Cashflow Model provides PropCap a competitive advantage it would otherwise never have due to its lack of experience servicing Ginnie Mae loans.

65. PropCap is now using PennyMac's methodology, formulas, data, assumptions, and documents to create its own pricing on EBO deals.

66. PropCap and Mr. Watts provided PennyMac's competitors with PennyMac's proprietary, trade secret information, allowing them to identify more profitable investment opportunities at PennyMac's expense.

## COUNT ONE

**Violation of Defend Trade Secrets Act (DTSA), 18 U.S.C. section 1836 *et seq*.**

67. PennyMac incorporates all above paragraphs by reference.

68. PennyMac owns its confidential, proprietary EBO Cashflow Model, including the framework and inputs.

69. The EBO Cashflow Model contains financial, business, technical, and economic, information, including patterns, compilations, formulas, methods, techniques, processes, procedures, programs, and codes.

70. PennyMac's confidential, proprietary, and trade secret information relates to products and services used in interstate commerce. PennyMac buys out Ginnie Mae EBO loans originated and secured by properties across the United States for re-performance and investment opportunities.

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

57552229;1

71. PennyMac has taken reasonable measures to keep the EBO Cashflow Model secret and confidential.

72. PennyMac has at all times maintained stringent security measures to preserve its EBO Cashflow Model's secrecy and all information patterns, compilations, formulas, methods, techniques, processes, procedures, programs, and codes contained within the EBO Cashflow Model confidential.

73. PennyMac's confidential, proprietary, and trade secret EBO Cashflow Model derives independent economic value from not being generally known or ascertainable through proper means by others who could obtain economic value from the Model's use or disclosure.

74. PropCap and Mr. Watts misappropriated PennyMac's EBO Cashflow Model by copying, forwarding, and retaining the EBO Cashflow Model kept on PennyMac's computers. They furthered the misappropriation by stealing EBO transaction deal documents and poaching targeted PennyMac employees with significant borrower data and Model information. PropCap and Mr. Watts knew and had reason to know the EBO Cashflow Model is PennyMac property. Mr. Watts acknowledged and agreed the Model is confidential and he is prohibited from obtaining it for his own personal use.

75. PropCap knows or has reason to know Mr. Watts acquired the EBO Cashflow Model through improper means. PropCap does not independently possess historical PennyMac borrower performance data and could only obtain the derived performance vectors and cash flow analysis through Mr. Watts' misappropriation.

76. PropCap and Mr. Watts' misappropriation was intentional, knowing, willful, malicious, fraudulent, and oppressive.

77. PropCap and Mr. Watts have used and will continue to use PennyMac's EBO Cashflow Model for their own economic benefit and to PennyMac's detriment if not enjoined through court order.

78. As a direct and proximate result of PropCap and Mr. Watts' conduct, PennyMac has and will continue to suffer severe competitive harm, irreparable injury,

and significant damages, in an amount to be proven at trial. PennyMac is entitled to exemplary damages and its attorney's fees.

79. PennyMac also seeks temporary, preliminary, and permanent injunctive relief to recover and protect its confidential, proprietary, and trade secret information and to protect other legitimate business interests.

## COUNT TWO

### Violation of California Uniform Trade Secrets Act (CUTSA), California Civil Code section 3426, *et seq.*

80. PennyMac incorporates all above paragraphs by reference.

81. PennyMac owns the trade secret—the EBO Cashflow Model containing confidential and proprietary data, formulas, assumptions, and vectors.

82. PropCap and Mr. Watts knew or should have known the EBO Cashflow Model is a trade secret, proprietary, and confidential. Mr. Watts acknowledged all PennyMac intellectual property, data, and reports constitute proprietary information and trade secrets. He knew PennyMac's EBO Cashflow Model contains non-public loan data, and proprietary formulas, assumptions, and vectors as a Model creator and user. PropCap does not independently possess PennyMac borrower performance data and could only obtain the statistical vector and cash flow analysis through Mr. Watts' misappropriation.

83. PennyMac undertook reasonable means to maintain the EBO Cashflow Model's secrecy, which Mr. Watts knew as a former PennyMac employee and EBO Cashflow Model creator and user. PennyMac requires employees adhere to company policy on confidentiality and outside entities execute non-disclosure agreements to obtain even limited EBO Cashflow Model information.

84. PennyMac's proprietary, trade secret information is unknown to others. PennyMac possesses significant non-public historical loan data as Ginnie Mae's largest loan originator and servicer.

85. PennyMac derives significant value from the EBO Cashflow Model to identify profitable investment opportunities.

86. PropCap and Mr. Watts stole the EBO Cashflow Model for their own economic gain to identify investment opportunities they can pass on to their own customers—direct PennyMac competitors.

87. PropCap and Mr. Watts misappropriated and threaten to further misappropriate the EBO Cashflow Model without PennyMac's consent.

88. As a direct and proximate result of PropCap and Mr. Watts' conduct, PennyMac has been injured and will continue to be injured in an amount exceeding the court's jurisdictional minimum.

89. PennyMac incurred and will continue to incur additional damages, costs, expenses, and attorney's fees as a result of PropCap and Mr. Watts' misappropriation.

90. PennyMac is entitled to exemplary damages under California Civil Code section 3426.3(c) because PropCap and Mr. Watts' actions were willful, malicious, and fraudulent, causing PropCap and Mr. Watts' unjust enrichment.

91. PennyMac is entitled to an injunction and order mandating PropCap and Mr. Watts return all trade secret information and cease and desist further misappropriation pursuant to California Civil Code section 3426.2.

92. PennyMac is also entitled to its attorney's fees. Cal. Civ. Code, § 3426.4.

### THIRD CLAIM FOR RELIEF

**Violation of California Business & Professions Code section 17200,** *et seq***.**

93. PennyMac incorporates all above paragraphs by reference.

94. PropCap and Mr. Watts engaged in unlawful, unfair, and fraudulent business acts and practices, including using PennyMac's systems without authorization and for an unauthorized purpose, stealing company property, and poaching employees to build an EBO investment group identical to PennyMac with insider information.

95. PropCap and Mr. Watts targeted specific employees with sensitive servicing, data, and system knowledge in order to circumvent their limitations and avoid investing in developing a lesser product.

96. Mr. Watts also stole proprietary EBO transaction deal documents, including

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

57552229;1

PennyMac's Flow Sale Agreement, Mortgage Servicing Agreement, Representation and Warranty Agreement, and Form of Purchase Confirmation, to create an EBO business identical to PennyMac's.

97. PropCap and Mr. Watts knew Mr. Watts breached PennyMac's employee handbook, code of conduct and ethics, and internal policies when Mr. Watts appropriated the EBO Cashflow Model and EBO transaction deal documents.

98. PropCap and Mr. Watts' acts and practices were unfair because the substantial harm PennyMac has and will suffer outweighs any justification PropCap or Mr. Watts may have for their conduct.

99. PennyMac is entitled to restitution and an order enjoining PropCap and Mr. Watts' further unfair competition.

## PRAYER FOR RELIEF

**WHEREFORE**, PennyMac requests the following relief:

1. Judgment in PennyMac's favor and against Mr. Watts and PropCap on all causes of action alleged herein;

2. Damages in an amount to be proven at trial, including exemplary damages;

3. Preliminary and permanent injunctive relief;

4. Attorneys' fees and costs of suit;

5. Prejudgment interest; and

6. Such other and further relief as the court deems just and proper.

Dated: April 6, 2021            **AKERMAN LLP**

By: */s/ Justin D. Balser*
     Justin D. Balser
     Parisa Jassim

Attorneys for Plaintiff
PRIVATE NATIONAL MORTGAGE ACCEPTANCE COMPANY, LLC

**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

57552229;1

AKERMAN LLP
601 W. FIFTH STREET, SUITE 300
LOS ANGELES, CALIFORNIA 90071
TEL.: (213) 688-9500 – FAX: (213) 627-6342